

CHALOS, O'CONNOR & DUFFY, LLP
Attorneys for Plaintiff
366 Main Street
Port Washington, New York 11050
Tel:  (516) 767-3600 / Fax:  (516) 767-3605
Eugene J. O'Connor (EO-9925)
Timothy Semenoro (TS-6847)
Andrew J. Warner (AW-5534)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
SIRIUS SHIPPING INC.

                Plaintiff,

        v.

ISLAND AGREGATE GROUP CAYMAN LTD.
d/b/a MONSEN AND WOOD SHIPPING LTD.,

               Defendants.
-----------------------------------------------------------------X

09  CV  _____

**VERIFIED COMPLAINT**

     Plaintiff SIRIUS SHIPPING INC. (hereinafter "SIRIUS"), by its attorneys, as and for its

Verified Complaint against the defendant ISLAND AGREGATE GROUP CAYMAN LTD.

(hereinafter "ISLAND") d/b/a MONSEN AND WOOD SHIPIPNG LTD (hereinafter

"MONSEN") alleges upon information and belief as follows:

<u>JURISDICTION</u>

     1.     This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure, and also falls under this Court's admiralty and maritime

jurisdiction pursuant to 28 U.S.C. § 1333.

     2.     The Court also has jurisdiction pursuant to 9 U.S.C. § 1, et seq. and 9 U.S.C. §

201, et seq.

THE PARTIES

3.      At all times material hereto, Plaintiff SIRIUS was and still is a business entity duly organized and existing pursuant to the laws of a foreign country with an office and principal place of business in St. Vincent and Grenadines.

4.      The Plaintiff SIRIUS was the owner or disponent owner of the vessel M/V LUNDENES and in the business chartering vessels, including the M/V LUNDENES, for the carriage of cargo in exchange for payments of hire.

5.      At all times material hereto, defendant ISLAND was and still is a business entity duly organized and existing pursuant to the laws of the a foreign country with an office and principal place of business at P.O. Box 864, Georgetown, Grand Cayman, Cayman Islands.

6.      The defendant ISLAND was the charterer of the vessel M/V LUNDENES, and in the business of chartering vessels, including the M/V LUNDENES for the carriage of goods by sea.

7.      At all times material hereto, defendant MONSEN was and still is a business entity duly organized and existing pursuant to the laws of the a foreign country with an office and principal place of business in the Cayman Islands.

8.      Upon information and belief, Defendant ISLAND was, and is, doing business under the name of Defendant MONSEN.  *See* Exhibit A.

FACTS AND CLAIM

9.      On or about December 13, 2006, Plaintiff SIRIUS entered into a charter party agreement with Defendant ISLAND, whereby SIRIUS agreed to charter the M/V LUNDENES to Defendant ISLAND for a period of 3 years.  *See* Exhibit B.

2

10.     The charter party agreement entered into between Plaintiff SIRIUS and Defendant ISLAND is a maritime contract in the form of a Time Charter incorporating the terms and conditions of a New York Produce Exchange standard chartered party agreement (hereinafter collectively referred to as the "maritime contract"). *See* Exhibit B.

11.     Pursuant to the terms and conditions of the maritime contract, Plaintiff SIRIUS and Defendant ISLAND agreed to, among other things, that ISLAND would pay hire to SIRIUS for the use of the vessel at a rate of US $3,600 per day, and that any disputes were to be submitted to New York arbitration and subject to U.S. law. *See* Exhibit B.

12.     Pursuant to the terms and conditions of the maritime contract, plaintiff SIRIUS delivered the vessel to Defendant ISLAND, ISLAND made use of the vessel, and hire was earned. *See* Exhibit C.

13.     To date, Defendant ISLAND had failed to make hire payments, in breach of the maritime contract.

14.     Despite due demand by Plaintiff SIRIUS to Defendants ISLAND, an amount of USD $381,456.91 remains due and owing to SIRIUS from ISLAND.

<u>DAMAGES AND AWARDABLE INTEREST</u>

15.     As previously indicated above, the maritime contract provides that any disputes arising under the maritime contract are subject to resolution under U.S. law and determination by a New York arbitration panel, none of which is deemed waived.

16.     Plaintiff SIRIUS will commence proceedings against Defendant ISLAND and MONSEN in New York pursuant to the maritime contract.

17.     Furthermore, the award of interest is allowed under U.S. law and is regularly awarded in maritime matters such as the subject dispute.

3

18.    The estimated damages for Plaintiff SIRIUS's claim against Defendants ISLAND and MONSEN is approximately

| | | | |
|---|---|---|---|
| A. | Principal claim | $ | 381,456.91 |
| B. | Estimated interest on claims:<br>3 years at 6%, compounded quarterly | $ | 68,619.90 |
| **Total** | | $ | **450,076.81** |

## PRAYER FOR RELIEF

19.    Notwithstanding the fact that the liability of Defendants ISLAND and MONSEN is subject to determination by New York arbitration, there are now, or will be during the pendency of this action, certain assets, accounts, freights, monies, charter hire, credits, effects, payment for bunkers, goods or services, bills of lading, cargo and the like belonging to or claimed by the Defendants within this District and held by various parties, as garnishees.

20.    Plaintiff SIRIUS has sufficient reason to believe that Defendant ISLAND's tangible or intangible personal property or other assets, *to wit*: bank accounts; payments of freight and/or hire in U.S. dollars to other vessel Owners from the Defendant and payments of U.S. dollars to the Defendant from third party Owners of cargo, vendors and/or suppliers; and/or Clearing House Interbank Payment System (CHIPS) credits; and/or operational funds being transferred through intermediary banks in the form of electronic payment transfers (i.e. "EFT"s) are located in this District in the possession of several garnishees and said garnishees are enumerated in the proposed Process of Maritime Attachment and Garnishment.

21.    Plaintiff SIRIUS's belief that defendants ISLAND and MONSEN's property may be found in the district is based on the fact that ISLAND and MONSEN have previously

transferred money to plaintiff SIRIUS in US Dollars which were routed through the Clearing House Interbank Payment System ("CHIPS") system and relating to the use of the subject vessel.

22.    Specifically, on December 5, 2007 defendant ISLAND made a payment to plaintiff SIRIUS in the amount of US $10,000.00 pursuant to the subject maritime contract via intermediary bank Wachovia in New York. A copy of the wire transfer detail is attached as Exhibit "D".

23.    Wachovia Bank, as well as 46 other financial institutions, participates in the CHIPS system in New York to send US dollar wire transfers between banks in the United States and throughout the world. *See* http://www.chips.org.

24.    Further, in the maritime industry, it is almost universally accepted that electronic (wire) funds transfers which are in US dollars will be through the CHIPS system in New York, of which 46 financial institutions participate.

25.    Pursuant to the terms and conditions of the subject maritime contract, all payments of hire from ISLAND and MONSEN to SIRIUS are to be made in US Dollars. Counsel's prior experience has indicated that the thirteen (13) below-named garnishee banks handle the vast majority of funds transfers in New York because this firm has in fact attached international wire transfers relating to commercial transactions in the maritime industry in these banks on many occasions.

26.    Accordingly, Plaintiff believes that some of these assets, in bank accounts and/or as funds being transferred through intermediary banks, are located in this District in the possession of garnishees, including ABN AMRO Bank, American Express Bank, Ltd., Bank of America, Bank of China, Bank of New York Mellon, Barclays Bank, Citibank NA, Deutsche

Bank, HSBC Bank, JP Morgan Chase Bank, Standard Chartered Bank, UBS AG, Wachovia

Bank, CHIPS, and possibly other banks or financial institutions located in New York.

27.     As set forth in the accompanying Declaration of Andrew J. Warner, Esq., the

Defendants ISLAND and MONSEN cannot be found within this District within the meaning of

Rule B of the Supplemental Rules for Admiralty or Maritime Claims of the Federal Rules of

Civil Procedure.

28.     Because this Verified Complaint sets forth an *in personam* maritime claim against

the Defendants ISLAND and MONSEN and because the Defendants cannot be found within this

District within the meaning of Rule B of the Supplemental Rules for Admiralty and Maritime

Claims of the Federal Rules of Civil Procedure, the requirement for a Rule B attachment and

garnishment are met and Plaintiff SIRIUS seeks the issuance of a Process of Maritime

Attachment and Garnishment so that it may obtain security for its claims against the Defendants

and/or *quasi in rem* jurisdiction over the property of the Defendants so that an eventual judgment

and/or award can be satisfied.


WHEREFORE, plaintiff prays as follows:

A.     That the Defendants ISLAND and MONSEN be summoned to appear and answer

this Verified Complaint;

B.     That the Defendants ISLAND and MONSEN not being found within this District

as set forth in the Declaration of Andrew J. Warner, Esq., then all of its assets, accounts, freights,

monies, charter hire, credits, effects, payment for bunkers, goods or services, bills of lading,

cargo and the like belonging to or claimed by the Defendants within this District up to the

amount sued for herein be attached pursuant to Rule B of the Supplemental Rules for Admiralty

6

and Maritime Claims of the Federal Rules of Civil Procedure and to pay Plaintiff SIRIUS's damages;

     C.     That this Court retain jurisdiction over this matter through the entry of a judgment either by this Court and/or the London arbitration panel, so that judgment may be entered in favor of Plaintiff SIRIUS for the amount of its claim with costs, *i.e.* **US $450,076.81**, and that a judgment of condemnation and sale be entered against the property arrested and attached herein in the amount of plaintiff's claim, plus costs to be paid out of the proceeds thereof; and

     D.     That Plaintiff SIRIUS has such other and further relief as the Court may determine to be just and proper under the circumstances.

Dated: Port Washington, New York
       September 21, 2009

                                             CHALOS, O'CONNOR & DUFFY LLP
                                             Attorneys for Plaintiff,

                                             Eugene J. O'Connor (EO-9925)
                                             Timothy Semenoro (TS-6847)
                                             Andrew J. Warner (AW-5534)
                                           366 Main Street
                                             Port Washington, New York
                                           Tel:    (516) 767-3600
                                         Fax:    (516) 767-3605

CHALOS, O'CONNOR & DUFFY, LLP
Attorneys for Plaintiff
366 Main Street
Port Washington, New York 11050
Tel:  (516) 767-3600 / Fax:  (516) 767-3605
Eugene J. O'Connor (EO-9925)
Timothy Semenoro (TS-6847)
Andrew J. Warner (AW-5534)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
SIRIUS SHIPPING INC.

                        Plaintiff,

                                                        09  CV  _____

            v.
                                                        **VERIFICATION OF
                                                        COMPLAINT**

ISLAND AGREGATE GROUP CAYMAN LTD.
d/b/a MONSEN AND WOOD SHIPIPNG LTD.,

                        Defendants.
-----------------------------------------------------------------X

        Pursuant to 28 U.S.C. § 1746, ANDREW J. WARNER, Esq., declares under the penalty

of perjury:

        1.      I am associated with the law firm of Chalos, O'Connor & Duffy, attorneys for the

Plaintiff SIRIUS SHIPPING INC. herein;

        2.      I have read the foregoing complaint and know the contents thereof; and

        3.      I believe the matters to be true based on documents and information obtained

from employees and representatives of the Plaintiff through its underwriters and attorneys. The

reason that this verification was made by deponent and not by the Plaintiff is because Plaintiff is

a foreign corporation, whose officers are not in this district, and whose verification cannot be

obtained within the time constraints presented by the circumstances of this case.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: Port Washington, New York
September 21, 2009

CHALOS, O'CONNOR & DUFFY, LLP
Attorneys for Plaintiff

By:    _____

Andrew J. Warner (AW-5534)
366 Main Street
Port Washington, New York 11050
Tel:  (516) 767-3600 / Fax:  (516) 767-3605

2

 **Split Ship Management** 

### Internet E-mail In: 15864-09

**From:** Monsen and Wood Shipping Ltd.
**Date:** 27.1.2009 20:41:19
**To:** ssmchart
**Subject:** Re: mv Lundenes Island Agregate DEBT!
**Attachments:**

Dear Sandro,

We did not change the name of the company to monsen and wood shipping ltd. this is something that we were going to do. It is still the same name.   I just changed on my email but we are not changing it again.

My dad if in surgery today, I will call you tomorrow to discuss.

Best Regards,

Sean

On Tue, Jan 27, 2009 at 10:06 AM, SSM - Chartering <ssm-chartering@ssm.htnet.hr> wrote:
> Dear Sean,
>
> See that You now changed the name of Your company, from
> Island Agregate to Monsen and Wood Shipping Ltd. Did You
> buy ships or You intend to buy, since the company is now named
> with word "shipping".
>
> We would require a very urgent response.
>
> Plsd to hear.
>
> Brgds
> Sandro
> ------ Original Message ------
> From: Monsen and Wood Shipping Ltd.
> To: SSM - Chartering
> Sent: 1/28/2009 9:30:00 PM
> Subject: Re: mv Lundenes Island Agregate DEBT!
> Sandro,
>>
>>Today is a holiday in Cayman.  I will call you tomorrow.
>>
>>Best Regards,
>>
>>Sean
>
>
> Approved by:
>
> Chartering Manager
> Sandro Bozic
>
>

| SPLIT SHIP MANAGEMENT | | |
|---|---|---|
| RECEIVED | | SENT |
| PRESIDENT & C.E.O. | | FLEET & QSE |
| FLEET & TEHNICAL | | FLEET & PERSONNEL |
| | | No: |
| Date: | 2 8 -01- 2009 | |
| CHARTERING | | FINANCIAL |
| MARKETING | | TRADING CENTRE |
| TRAVEL AGENCY | | SM HEAD |
| | | FORM - 161 V03 |

B 1.8



Code Name: "NYPE 93"
Recommended by:
The Baltic International Maritime Council (BIMCO)
The Federation of National Associations of
Ship Brokers and Agents (FONASBA)

# TIME CHARTER©
New York Produce Exchange Form
Issued by Association of Ship Brokers and Agents (U.S.A.), Inc.

November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946;
Revised June 12th, 1981; September 14th, 1993.

THIS CHARTER PARTY made and concluded in        SPLIT                                  1
this     18       day of          DECEMBER          20  06                              2

Between: Sirius Shipping Inc.Trust House 112,Bonadie Street,Kingstown,Saint Vincent    3
                                                                                       4
Owners of the Vessel described below and    Island Agregate Group Cayman Ltd           5
                                                                                       6
Charterers                                                                             7

Description of Vessel                                                                  8

Name   Lundenes                Flag  Panama        Built  1972           year.        10
Port and number of Register:   Panama                                                 11
Classed  DNV                                                                          12
Deadweight   2600 sdwcc/3550 wdwcc     long/metric tons (cargo and bunkers including freshwater and  13
stores not exceeding                   long/(metric) tons) on a salt water draft of   14
on summer freeboard                                                                   15
Capacity  118,000          cubic feet grain  114,000         cubic feet bale space.   16
Tonnage  1731/1143          GT/GRT                                                    17
Speed about  11        knots fully laden, in good weather conditions up to and including maximum  18
Force   4       on the Beaufort wind scale, on a consumption of about   9.3     long/metric  19
tons of   MGO                                                                         20

* Delete as appropriate                                                               21
For further description see Appendix "A" (if applicable)                              22

1.   **Duration**                                                                     23

The Owners agree to let and the Charterers agree to hire the Vessel from the time of delivery for a period  24
of                                                                                   25
5 months straight                                                                    26
                                                                                     27
                                        within below mentioned trading limits.        28

Printed and sold by Fr. G. Knudtzens Bogtrykkeri A/S
with permission of ASBA, NY, Tel/Fax +45 3385 2701

2.    Delivery                                                                                           29

The Vessel shall be placed at the disposal of the Charterers at  ..................................    30
.......in western part of North Europe ..........    ..    ......................................    31
..............................    ..    ..............................    ..    The Vessel on her delivery    32
shall be ready to receive cargo with clean-swept holds and tight, staunch, strong and in every way fitted    33
for ordinary cargo service, having water ballast and with sufficient power to operate all cargo-handling gear    34
simultaneously.                                                                                         35

The Owners shall give the Charterers not less than  ..........    5  days notice of expected date of    36
delivery.                                                                                               37

3.    On-Off Hire Survey                                                                                39

Prior to delivery and redelivery the parties shall, unless otherwise agreed, each appoint surveyors, for their    40
respective accounts, who shall not later than at first loading port/last discharging port respectively, conduct    41
joint on-hire/off-hire surveys  for the purpose of ascertaining quantity of bunkers on board and the condition    42
of the Vessel. A single report shall be prepared on each occasion and signed by each surveyor, without    43
prejudice to his right to file a separate report setting forth items upon which the surveyors cannot agree.    44
If either party fails to have a representative attend the survey and sign the joint survey report such party    45
shall nevertheless be bound for all purposes by the findings in any report prepared by the other party.    46
On-hire survey shall be on Charterers' time and off-hire survey on Owners' time.                        47

4.    Dangerous Cargo/Cargo Exclusions                                                                   48

(a)    The Vessel shall be employed in carrying lawful merchandise excluding any goods of a dangerous,    49
injurious, flammable or corrosive nature unless carried in accordance with the requirements or    50
Recommendations of the competent authorities of the country of the Vessel's registry and of ports of    51
shipment and discharge and of any intermediate countries or ports through whose waters the Vessel must    52
pass. Without prejudice to the generality of the foregoing, in addition the following are specifically    53
excluded: livestock of any description, arms, ammunition, explosives, nuclear and radioactive materials,    54
..............................    ..    ..............................    ..    ..............................    55
..............................    ..    ..............................    ..    ..............................    56
..............................    ..    ..............................    ..    ..............................    57
..............................    ..    ..............................    ..    ..............................    58
..............................    ..    ..............................    ..    ..............................    59
..............................    ..    ..............................    ..    ..............................    60
..............................    ..    ..............................    ..    ..............................    61
..............................    ..    ..............................    ..    ..............................    62
..............................    ..    ..............................    ..    ..............................    63
..............................    ..    ..............................    ..    ..............................    64

(b)    If IMO-classified cargo is agreed to be carried, the amount of such cargo shall be limited to    85
..............................    tons and the Charterers shall provide the Master with any evidence he may    86
reasonably require to show that the cargo is packaged, labeled, loaded and stowed in accordance with IMO    87
regulations, failing which the Master is entitled to refuse such cargo or, if already loaded, to unload it at    88
the Charterers' risk and expense.                                                                       89

5.    **Trading Limits**                                                                70

The Vessel shall be employed in such lawful trades between safe ports and safe places    71
within ........................................ Carribean Sea/South part of NA/N part of SA/Central America    72
........................................................................................... excluding    73
....................................................................................................    74
....................................................................................................    75
............................................................................... as the Charterers shall direct    76

6.    **Owners to Provide**                                                             77

The Owners shall provide and pay for the insurance of the Vessel, except as otherwise provided, and for    78
all provisions, cabin, deck, engine-room and other necessary stores, including boiler water; shall pay for    79
wages, consular shipping and discharging fees of the crew and charges for port services pertaining to the    80
crew; shall maintain the Vessel's class and keep her in a thoroughly efficient state in hull, machinery and    81
equipment for and during the service, and have a full complement of officers and crew.    82

7.    **Charterers to Provide**                                                         83

The Charterers, while the Vessel is on hire, shall provide and pay for all the bunkers except as otherwise    84
agreed; shall pay for port charges (including compulsory watchmen and cargo watchmen and compulsory    85
garbage disposal), all communication expenses pertaining to the Charterers' business at cost, pilotages,    86
towages, agencies, commissions, consular charges (except those pertaining to individual crew members    87
or flag of the Vessel), and all other usual expenses except those stated in Clause 6, but when the Vessel    88
puts into a port for causes for which the Vessel is responsible (other than by stress of weather), then all    89
such charges incurred shall be paid by the Owners. Fumigations ordered because of illness of the crew    90
shall be for the Owners' account. Fumigations ordered because of cargoes carried or ports visited while    91
the Vessel is employed under this Charter Party shall be for the Charterers' account. All other fumigations    92
shall be for the Charterers' account after the Vessel has been on charter for a continuous period of six    93
months or more.    94

The Charterers shall provide and pay for necessary dunnage and also any extra fittings requisite for a    95
Special trade or unusual cargo, but the Owners shall allow them the use of any dunnage already aboard    96
the Vessel. Prior to redelivery the Charterers shall remove their dunnage and fittings at their cost and in    97
their time.    98

8.    **Performance of Voyages**                                                        99

(a)  The Master shall perform the voyages with due despatch, and shall render all customary assistance    100
with the Vessel's crew. The Master shall be conversant with the English language and (although    101
appointed by the Owners) shall be under the orders and directions of the Charterers as regards    102
employment and agency, and the Charterers shall perform all cargo handling, including but not limited to    103
loading, stowing, trimming, lashing, securing, dunnaging, unlashing, discharging, and tallying, at their risk    104
and expense, under the supervision of the Master.    105

(b)  If the Charterers shall have reasonable cause to be dissatisfied with the conduct of the Master or    106
officers, the Owners shall, on receiving particulars of the complaint, investigate the same, and, if    107
necessary, make a change in the appointments.    108

9.   Bunkers                                                                                                   109

(a)   The Charterers on delivery, and the Owners on redelivery, shall take over and pay for all fuel and   110
diesel oil remaining on board the Vessel as hereunder. The Vessel shall be delivered with:   111
............. ............. long*/metric* tons of fuel oil at the price of   As per last paid   per ton;   112
............. ............. tons of diesel oil at the price of   As per last paid   per ton. The vessel shall   113
be redelivered with:   ...... ........ tons of fuel oil at the price of   ......As per last paid   per ton;   114
............. ............. tons of diesel oil at the price of   As per last paid   per ton.   115

* Same tons apply throughout this clause.   116

(b)   The Charterers shall supply bunkers of a quality suitable for burning in the Vessel's engines   117
and auxiliaries and which conform to the specification(s) as set out in Appendix A.   118

The Owners reserve their right to make a claim against the Charterers for any damage to the main engines   119
or the auxiliaries caused by the use of unsuitable fuels or fuels not complying with the agreed   120
specification(s). Additionally, if bunker fuels supplied do not conform with the mutually agreed   121
specification(s) or otherwise prove unsuitable for burning in the Vessel's engines or auxiliaries, the Owners   122
shall not be held responsible for any reduction in the Vessel's speed performance and/or increased bunker   123
consumption, nor for any time lost and any other consequences.   124

10.   Rate of Hire/Redelivery Areas and Notices   125

The Charterers shall pay for the use and hire of the said Vessel at the rate of $   ...... .............   3,600,00   126
U.S. currency, daily, or $   ............. ...... U.S. currency per ton on the Vessel's total deadweight   127
carrying capacity, including bunkers and stores, on   summer freeboard, per 30 days,   128
commencing on and from the day of her delivery, as aforesaid, and at and after the same rate for any part   129
of a month; hire shall continue until the hour of the day of her redelivery in like good order and condition,   130
ordinary wear and tear excepted, to the Owners (unless Vessel lost) at   131
............. ...... ...... 1 sp/sb within trading area   132
...... ............. ...... ............. ......   133
...... ............. ...... ............. unless otherwise mutually agreed.   134

The Charterers shall give the Owners not less than   ............. ......   30   days notice of the Vessel's   135
expected date and probable port of redelivery.   136

For the purpose of hire calculations, the times of delivery, redelivery or termination of charter shall be   137
adjusted to GMT.   138

11.   Hire Payment   139

(a)   Payment   140

Payment of Hire shall be made so as to be received by the Owners or their designated payee in   141
...... viz   142
...... ............. ...... ............. Will be advised timely   143
...... ............. ...... ............. ......   144
...... ............. ...... ............. ...... in   145

USD_____ currency, or in United States Currency in funds available to the     146
Owners on the due date. 15 days in advance and for the last month or part of same the approximate     147
amount of hire, and should same not cover the actual time hire shall be paid for the balance day by day     148
as it becomes due, if so required by the Owners. Failing the punctual and regular payment of the hire     149
or on any fundaments, breach whatsoever of this Charter Party the Owners shall be at liberty to     150
withdraw the Vessel from the service of the Charterers without prejudice to any claims they (the Owners,     151
may otherwise have on the Charterers.     152

At any time after the expiry of the grace period provided in Sub-clause 11 (b) hereunder and while the     153
hire is outstanding the Owners shall, without prejudice to the liberty to withdraw, be entitled to withhold     154
the performance of any and all of their obligations hereunder and shall have no responsibility whatsoever     155
for any consequences thereof in respect of which the Charterers hereby indemnify the Owners, and hire     156
shall continue to accrue and any extra expenses resulting from such withholding shall be for the     157
Charterers' account.     158

(b)    *Grace Period*     159

Where there is failure to make punctual and regular payment of hire due to oversight, negligence, errors     160
or omissions on the part of the Charterers or their bankers, the Charterers shall be given by the Owners     161
_3____ clear banking days (as recognized at the agreed place of payment) written notice to rectify the     162
failure, and when so rectified within those _3____ days following the Owners' notice, the payment shall     163
stand as regular and punctual.     164

Failure by the Charterers to pay the hire within _3_____ days of their receiving the Owners' notice as     165
provided herein, shall entitle the Owners to withdraw as set forth in Sub-clause 11 (a) above     166

(c)    *Last Hire Payment*     167

Should the Vessel be on her voyage towards port of redelivery at the time the last and/or the penultimate     168
payment of hire is/are due, said payment(s) is are to be made for such length of time as the Owners and     169
the Charterers may agree upon as being the estimated time necessary to complete the voyage, and taking     170
into account bunkers actually on board, to be taken over by the Owners and estimated disbursements for     171
the Owners' account before redelivery. Should same not cover the actual time hire is to be paid for the     172
balance, day by day, as it becomes due. When the Vessel has been redelivered, any difference is to be     173
refunded by the Owners or paid by the Charterers as the case may be.     174

(d)    *Cash Advances*     175

Cash for the Vessel's ordinary disbursements at any port may be advanced by the Charterers, as required     176
by the Owners, subject to 2S percent commission and such advances shall be deducted from the hire.     177
The Charterers, however, shall in no way be responsible for the application of such advances.     178

**12.    Berths**     179

The Vessel shall be loaded and discharged in any safe dock or at any safe berth or safe place that     180
Charterers or their agents may direct, provided the Vessel can safely enter, lie and depart always afloat     181
at any time of tide.     182

13.     Spaces Available                                                                 183

(a)   The whole reach of the Vessel's holds, decks and other cargo spaces (not more than she can   184
reasonably and safely stow and carry), also accommodations for supercargo, if carried, shall be at the   185
Charterers' disposal, reserving only proper and sufficient space for the Vessel's officers, crew, tackle,   186
apparel, furniture, provisions, stores and fuel.                                         187

(b)   In the event of deck cargo being carried, the Owners are to be and are hereby indemnified by the   188
Charterers for any loss and/or damage and/or liability of whatsoever nature caused to the Vessel as a   189
result of the carriage of deck cargo and which would not have arisen had deck cargo not been loaded.   190

14.     Supercargo and Meals                                                             191

The Charterers are entitled to appoint a supercargo, who shall accompany the Vessel at the Charterers'   192
risk and see that voyages are performed with due despatch. He is to be furnished with free   193
accommodation and same fare as provided for the Master's table, the Charterers paying at the rate of   194
Usd 10,00                per day. The Owners shall victual pilots and customs officers, and also, when   195
authorized by the Charterers or their agents, shall victual tally clerks, stevedore's foreman etc.,   196
Charterers paying at the rate of __Usd 6,5_____ per meal for all such victualling.   197

15.     Sailing Orders and Logs                                                          198

The Charterers shall furnish the Master from time to time with all requisite instructions and sailing   199
directions, in writing, in the English language, and the Master shall keep full and correct deck and engine   200
logs of the voyage or voyages, which are to be patent to the Charterers or their agents, and furnish the   201
Charterers, their agents or supercargo, when required with a true copy of such deck and engine logs,   202
showing the course of the Vessel, distance run and the consumption of bunkers. Any log extracts   203
required by the Charterers shall be in the English language.                             204

16.     Delivery/Cancelling                                                              205

If required by the Charterers, time shall not commence before   18.Dec.2006_____ and should the   206
Vessel not be ready for delivery on or before  30.Dec.2006_____ but not later than   2400___ hours   207
the Charterers shall have the option of cancelling this Charter Party.                    208

        Extension of Cancelling                                                          209

If the Owners warrant that, despite the exercise of due diligence by them, the Vessel will not be ready   210
for delivery by the cancelling date, and provided the Owners are able to state with reasonable certainty   211
the date on which the Vessel will be ready, they may, at the earliest seven days before the Vessel is   212
expected to sail for the port or place of delivery, require the Charterers to declare whether or not they will   213
cancel the Charter Party. Should the Charterers elect not to cancel, or should they fail to reply within two   214
days of or by the cancelling date, whichever shall first occur, then the seventh day after the expected date   215
of readiness for delivery as notified by the Owners shall replace the original cancelling date. Should the   216
Vessel be further delayed, the Owners shall be entitled to require further declarations of the Charterers in   217
accordance with this Clause.                                                             218

17.  <u>Off Hire</u>                                                                    319

In the event of loss of time from deficiency and/or default and/or strike of officers or crew, or deficiency   320
of stores, fire, breakdown of, or damages to hull, machinery or equipment, grounding, detention by the   321
arrest of the Vessel, (unless such arrest is caused by events for which the Charterers, their servants,   322
agents or subcontractors are responsible), or detention by average accidents to the Vessel or cargo unless   323
resulting from inherent vice, quality or defect of the cargo, drydocking for the purpose of examination or   324
painting bottom, or by any other similar cause preventing the full working of the Vessel, the payment of   325
hire and overtime, if any, shall cease for the time thereby lost. Should the Vessel deviate or put back   326
during a voyage, contrary to the orders or directions of the Charterers, for any reason other than accident   327
to the cargo or where permitted in lines 257 to 258 hereunder, the hire is to be suspended from the time   328
of her deviating or putting back until she is again in the same or equidistant position from the destination   329
and the voyage resumed therefrom. All bunkers used by the Vessel while off hire shall be for the Owners'   330
account. In the event of the Vessel being driven into port or to anchorage through stress of weather,   331
trading to shallow harbors or to rivers or ports with bars, any detention of the Vessel and/or expenses   332
resulting from such detention shall be for the Charterers' account. If upon the voyage the speed be   333
reduced by defect in, or breakdown of, any part of her hull, machinery or equipment, the time so lost, and   334
the cost of any extra bunkers consumed in consequence thereof, and all extra proven expenses may be   335
deducted from the hire.                                                                 336

18.  <u>Sublet</u>                                                                      337

Unless otherwise agreed, the Charterers shall have the liberty to sublet the Vessel for all or any part of   338
the time covered by this Charter Party, but the Charterers remain responsible for the fulfillment of this   339
Charter Party.                                                                          340

19.  <u>Drydocking</u>                                                                  341

The Vessel was last drydocked _____   342

*(a)  The Owners shall have the option to place the Vessel in drydock during the currency of this Charter   343
at a convenient time and place, to be mutually agreed upon between the Owners and the Charterers, for   344
bottom cleaning and painting and/or repair as required by class or dictated by circumstances.   345

*(b)  Except in case of emergency no drydocking shall take place during the currency of this Charter   346
Party.                                                                                  347

* Delete as appropriate                                                                 348

20.  <u>Total Loss</u>                                                                  349

Should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or   350
being last heard of) shall be returned to the Charterers at once.                       351

21.  <u>Exceptions</u>                                                                  352

The act of God, enemies, fire, restraint of princes, rulers and people, and all dangers and accidents of the   353
seas, rivers, machinery, boilers, and navigation, and errors of navigation throughout this Charter, always   354
mutually excepted.                                                                      355

22.    Liberties                                                                                        256

The Vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels    257
in distress, and to deviate for the purpose of saving life and property.                                257

23.    Liens                                                                                            259

The Owners shall have a lien upon all cargoes and all sub-freights and/or sub-hire for any amounts due    260
under this Charter Party, including general average contributions, and the Charterers shall have a lien on    261
the Vessel for all monies paid in advance and not earned  and any overpaid hire or excess deposit to be    262
returned at once.                                                                                      263

The Charterers will not directly or indirectly suffer, nor permit to be continued, any lien or encumbrance,    264
Which might have priority over  the title and interest of the Owners in the Vessel. The Charterers    265
undertake that during the period of this Charter Party, they will not procure any supplies or necessaries    266
or services, including any port expenses and bunkers, on the credit of the Owners or in the Owners' time.    267

24.    Salvage                                                                                          268

All derelicts and salvage shall be for the Owners' and the Charterers' equal benefit after deducting    269
Owners' and Charterers' expenses and crew's proportion.                                                270

25.    General Average                                                                                  271

General average shall be adjusted according to York-Antwerp Rules 1974, as amended 1990, or any    272
subsequent modification thereof in   In London _ _ _ _ _ _ _ _ _ _ and settled in  usd _ _ _ _ _ _ _ _ _ _    273
currency.                                                                                              274

The Charterers shall procure that all bills of lading issued during the currency of the Charter Party will    275
contain a provision to the effect that general average shall be adjusted according to York-Antwerp Rules    276
1974, as amended 1990, or any subsequent modification thereof and will include the "New Jason    277
Clause" as per Clause 31.                                                                              278

Time charter hire shall not contribute to general average.                                             279

26.    Navigation                                                                                       280

Nothing herein stated is to be construed as a demise of the  Vessel to the Time Charterers. The Owners    281
shall remain responsible  for the  navigation of the  Vessel, acts of pilots and tug boats, insurance, crew,    282
and all other matters, same as when trading for their own account.                                     283

27.    Cargo Claims                                                                                     284

Cargo claims as between the Owners and the Charterers shall be settled in accordance with the  Inter-Club    285
New York Produce  Exchange Agreement of  February 1970,  as amended May,  1984,  or any subsequent    286
modification or replacement thereof.                                                                   287

28.    Cargo Gear and Lights                                                    288

The Owners shall maintain the cargo handling gear of the Vessel which is as follows.    289
Excavator Aakerman H16D, outreach abt 8 meters fm ships side    290
                                                                               291
                                                                               292
providing gear (for all derricks or cranes) capable of lifting capacity as described. The Owners shall also    293
provide on the Vessel for night work lights as on board, but all additional lights over those on board shall    294
be at the Charterers' expense. The Charterers shall have the use of any gear on board the Vessel. If    295
required by the Charterers, the Vessel shall work night and day and all cargo handling gear shall be at the    296
Charterers' disposal during loading and discharging. In the event of disabled cargo handling gear, or    297
insufficient power to operate the same, the Vessel is to be considered to be off hire to the extent that    298
time is actually lost to the Charterers and the Owners to pay stevedore stand-by charges occasioned    299
thereby, unless such disablement or insufficiency of power is caused by the Charterers' stevedores. If    300
required by the Charterers, the Owners shall bear the cost of hiring shore gear in lieu thereof, in which    301
case the Vessel shall remain on hire    302

29.    Crew Overtime                                                           303

In lieu of any overtime payments to officers and crew for work ordered by the Charterers or their agents,    304
the Charterers shall pay the Owners concurrently with the hire    USD 1.000,00 _ _ _ _ _ _ _ _ _    per month    305
or pro rata.                                                                   306

30.    Bills of Lading                                                        307

(a)   The Master shall sign the bills of lading or waybills for cargo as presented in conformity with mates    308
or tally clerk's receipts. However, the Charterers may sign bills of lading or waybills on behalf of the    309
Master, with the Owners' prior written authority, always in conformity with mates or tally clerk's receipts.    310

(b)   All bills of lading or waybills shall be without prejudice to this Charter Party and the Charterers shall    311
indemnify the Owners against all consequences or liabilities which may arise from any inconsistency    312
between this Charter Party and any bills of lading or waybills signed by the Charterers or by the Master    313
at their request.                                                              314

(c)   Bills of lading covering deck cargo shall be claused: "Shipped on deck at Charterers', Shippers' and    315
Receivers' risk, expense and responsibility  without liability on the part of the Vessel, or her Owners for    316
any loss, damage, expense or delay howsoever caused."                          317

31.    Protective Clauses                                                     318

This Charter Party is subject to the following clauses all of which are also to be included in all bills of    319
lading or waybills issued hereunder:                                          320

(a)    CLAUSE PARAMOUNT                                                       321
"This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the    322
United States, the Hague Rules, or the Hague-Visby Rules, as applicable, or such other similar national    323
legislation as may mandatorily apply by virtue of origin or destination of the bills of lading, which shall    324
be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the    325

carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said    335
Applicable Act. If any term of this bill of lading be repugnant to said applicable Act to any extent, such    337
term shall be void to that extent but no further."    338

and    339

(b)    BOTH-TO-BLAME COLLISION CLAUSE    331
"If the ship comes into collision with another ship as a result of the negligence of the other ship and any    331
act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in    332
the management of the ship, the owners of the goods carried hereunder will indemnify the carrier against    333
all loss or liability to the other or non-carrying ship or her owners insofar as such loss or liability represents    334
loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other    335
or non-carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the    336
other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier.    337

The foregoing provisions shall also apply where the owners, operators or those in charge of any ships or    339
objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or    339
contact."    340

and    341

(c)    NEW JASON CLAUSE    342
"In the event of accident, danger, damage or disaster before or after the commencement of the voyage    343
Resulting from any cause whatsoever, whether due to negligence or not, for which or for the    344
Consequences of which, the carrier is not responsible, by statute, contract, or otherwise, the goods,    345
shippers, consignees or owners of the goods shall contribute with the carrier in general average to the    346
payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred    347
and shall pay salvage and special charges incurred in respect of the goods.    348

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if salving ship    349
or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover    350
the estimated contribution of the goods and any salvage and special charges thereon shall, if required,    351
be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery."    352

and    353

(d)    U.S. TRADE - DRUG CLAUSE    354
"In pursuance of the provisions of the U.S. Anti Drug Abuse Act 1986 or any re-enactment thereof the    355
Charterers warrant to exercise the highest degree of care and diligence in preventing unmanifested    356
narcotic drugs and marijuana to be loaded or concealed on board the Vessel.    357

Non-compliance with the provisions of this clause shall amount to breach of warranty for consequences    358
of which the Charterers shall be liable and shall hold the Owners, the Master and the crew of the Vessel,    356
harmless and shall keep them indemnified against all claims whatsoever which may arise and be made    360
against them individually or jointly. Furthermore, all time lost and all expenses incurred, including fines,    361
as a result of the Charterers' breach of the provisions of this clause shall be for the Charterer's account    362
and the Vessel shall remain on hire.    363

Should the Vessel be arrested as a result of the Charterers' non-compliance with the provisions of this   364
clause, the Charterers shall at their expense take all reasonable steps to secure that within a reasonable   365
time the Vessel is released and at their expense put up the bail to secure release of the Vessel.   366

The Owners shall remain responsible for all time lost and all expenses incurred, including fines, in the   367
event that unmanifested narcotic drugs and marijuana are found in the possession or effects of the   368
Vessel's personnel."   369

and   370

(e)   WAR CLAUSES   371
"(i) No contraband of war shall be shipped. The Vessel shall not be required, without the consent of the   372
Owners, which shall not be unreasonably withheld, to enter any port or zone which is involved in a state   373
of war, warlike operations or hostiles, civil strife, insurrection or piracy whether there be a declaration   374
of war or not, where the Vessel, cargo or crew might reasonably be expected to be subject to capture,   375
seizure or arrest, or to a hostile act by a belligerent power (the term "power" meaning any de jure or de   376
facto authority or any purported governmental organization maintaining naval, military or air forces).   377
(ii) If such consent is given by the Owners, the Charterers will pay the provable additional cost of insuring
the Vessel against hull war risks in an amount equal to the value under her ordinary hull policy but not
exceeding a valuation   _As per insurers add premium_   in addition, the Owners may purchase and the   379
Charterers will pay for war risk insurance on ancillary risks such as loss of hire, freight disbursements   380
total loss, blocking and trapping, etc. If such insurance is not obtainable commercially or through a   381
government program, the Vessel shall not be required to enter or remain at any such port or zone.   382
(iii) In the event of the existence of the conditions described in (i) subsequent to the date of this Charter,   383

   384
or while the Vessel is on hire under this Charter, the Charterers shall, in respect of voyages to any such   385
port or zone assume the provable additional cost of wages and insurance properly incurred in connection   386
with master, officers and crew as a consequence of such war warlike operations or hostilities.   387

(iv) Any war bonus to officers and crew due to the Vessel's trading or cargo carried shall be for the   388
Charterers' account."   389

32.   Underline War Cancellation   390

In the event of the outbreak of war (whether there be a declaration of war or not) between any two or   391
more of the following countries:   392
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   393
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   394

either the Owners or the Charterers may cancel this Charter Party. Whereupon, the Charterers shall   395
Redeliver the Vessel to the Owners in accordance with Clause 10; if she has cargo on board, after   396
discharge thereof at destination, or, if debarred under this Clause from reaching or entering it, at a near   397
open and safe port as directed by the Owners; or, if she has no cargo on board, at the port at which she   398
then is; or, if at sea, at a near open and safe port as directed by the Owners. In all cases hire shall   399
continue to be paid in accordance with Clause 11 and except as aforesaid all other provisions of this   401
Charter Party shall apply until redelivery.   402

33.    Ice                                                                                         403

The Vessel shall not be required to enter or remain in any icebound port or area, nor any port or area   404
where lights or lightships have been or are about to be withdrawn by reason of ice, nor where there is   405
risk that in the ordinary course of things the Vessel will not be able on account of ice to safely enter and   406
remain in the port or area or to get out after having completed loading or discharging. Subject to the   407
Owners' prior approval the Vessel is to follow ice-breakers when reasonably required with regard to her   408
size, construction and ice class.                                                                  409

34.    Requisition                                                                                 410

Should the Vessel be requisitioned by the government of the Vessel's flag during the period of this Charter   411
Party, the Vessel shall be deemed to be off hire during the period of such requisition, and any hire paid   412
by the said government in respect of such requisition period shall be retained by the Owners. The period   413
during which the Vessel is on requisition to the said government shall count as part of the period provided   414
for in this Charter Party.                                                                         415

If the period of requisition exceeds ___6_____ months, either party shall have the option   416
of cancelling this Charter Party and no consequential claim may be made by either party.            417

35.    Stevedore Damage                                                                           418

Notwithstanding anything contained herein to the contrary, the Charterers shall pay for any and all   419
damage to the Vessel caused by stevedores provided the Master has notified the Charterers and/or their   420
agents in writing as soon as practical but not later than 24 hours after any damage is discovered. Such   421
notice to specify the damage in detail and to invite Charterers to appoint a surveyor to assess the extent   422
of such damage.                                                                                   423

(a)  In case of any and all damage(s) affecting the Vessel's seaworthiness and/or the safety of the crew   424
and/or affecting the trading capabilities of the Vessel including class requirements the Charterers shall   
immediately arrange for repairs                                                                    425
of such damage(s) at their expense and the Vessel is to remain on hire until such repairs are completed   426
and if required passed by the Vessel's classification society.                                     427

(b) Any and all damage(s) not described under point (a) above shall be repaired at the Charterers' option,   428
before or after redelivery concurrently with the Owners' work. In such case no hire and/or expenses will   429
be paid to the Owners except and insofar as the time and/or the expenses required for the repairs for   430
which the Charterers are responsible, exceed the time and/or expenses necessary to carry out the   431
Owners' work.                                                                                     432

36.    Cleaning of Holds                                                                          433

The Charterers shall provide and pay extra for sweeping and/or washing and/or cleaning of holds between   434
voyages and/or between cargoes provided such work can be undertaken by the crew and is permitted by   435
local regulations, at the rate of ___USD 800,00_____ per hold.                  436

In connection with any such operation, the Owners shall not be responsible if the Vessel's holds are not   437
accepted or passed by the port or any other authority. The Charterers shall have the option to re-deliver   438
the Vessel with unclean/unswept holds against a lumpsum payment of ___USD 3.000,00___ in lieu of cleaning.   439

37.    **Taxes**

Charterers to pay all local, State, National taxes and/or dues assessed on the Vessel or the Owners resulting from the Charterers orders herein, whether assessed during or after the currency of this Charter Party including any taxes and/or dues on cargo and/or freights and/or sub-freights and/or hire (excluding taxes levied by the country of the flag of the Vessel or the Owners)

38.    **Charterers' Colors**

The Charterers shall have the privilege of flying their own house flag and painting the Vessel with their own markings. The Vessel shall be repainted in the Owners' colors before termination of the Charter Party. Cost and time of painting, maintaining and repainting those changes effected by the Charterers shall be for the Charterers' account.

39.    **Laid up Returns**

The Charterers shall have the benefit of any return insurance premium receivable by the Owners from their underwriters as and when received from underwriters by reason of the Vessel being in port for a minimum period of 30 days if on full hire for this period or pro rata for the time actually on hire.

40.    **Documentation**

The Owners shall provide any documentation relating to the Vessel that may be required to permit the Vessel to trade within the agreed trade limits including, but not limited to certificates of financial responsibility for oil pollution, provided such oil pollution certificates are obtainable from the Owners P & I club, valid international tonnage certificate, Suez and Panama tonnage certificates, valid certificate of registry and certificates relating to the strength and/or serviceability of the Vessel's gear.

41.    **Stowaways**

(a)    (i)   The Charterers warrant to exercise due care and diligence in preventing stowaways in gaining access to the Vessel by means of secreting away in the goods and or containers shipped by the Charterers.

(ii)  If, despite the exercise of due care and diligence by the Charterers, stowaways have gained access to the Vessel by means of secreting away in the goods and/or containers shipped by the Charterers, this shall amount to breach of charter for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all Claims whatsoever which may arise and be made against them. Furthermore all time lost and all expenses whatsoever and howsoever incurred including fines, shall be for the Charterers' account and the Vessel shall remain on hire.

(iii) Should the Vessel be arrested as a result of the Charterers' breach of charter according to sub-clause (a)(ii) above, the Charterers shall take all reasonable steps to secure that, within a reasonable time, the Vessel is released and at their expense put up bail to secure release of the Vessel.

(b)     (i)   If, despite the exercise of due care and diligence by the Owners, stowaways have gained     478
access to the Vessel by means other than secreting away in the goods and/or containers shipped     479
by the Charterers, all time lost and all expenses whatsoever and howsoever incurred, including     477
fines, shall be for the Owners' account and the Vessel shall be off hire.

(ii)  Should the Vessel be arrested as a result of stowaways having gained access to the Vessel     479
by means other than secreting away in the goods and/or containers shipped by the Charterers,     480
the Owners shall take all reasonable steps to secure that, within a reasonable time, the Vessel     481
is released and at their expense put up bail to secure release of the Vessel.     482

42.   Smuggling                                                                                         483

In the event of smuggling by the Master, Officers and/or crew, the Owners shall bear the cost of any     484
fines, taxes, or imposts levied and the Vessel shall be off hire for any time lost as a result thereof.     485

43.   Commissions                                                                                      486

A commission of   3 %   percent is payable by the Vessel and the Owners to     487
............ NAUTECH  MARINE  Consultants, Inc ....................................     488
                                                                                                       489
                                                                                                       490
on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter     491

44.   Address Commission                                                                               492

An address commission of                         percent is payableto ...............................     493
                                                                                                       494
                                                                                                       495
................................ on hire earned and paid under this Charter     496

45.   Arbitration                                                                                      497

(a)    NEW YORK                                                                                         498
All disputes arising out of this contract shall be arbitrated at New York in the following manner and     499
subject to U.S. Law.                                                                                   500

One Arbitrator is to be appointed by each of the parties hereto and a third by the two so chosen. Their     501
Decision or that of any two of them shall be final, and for the purpose of enforcing any award this     502
agreement may be made a rule of the court. The Arbitrators shall be commercial men, conversant with     503
Shipping matters. Such Arbitration is to be conducted in accordance with the rules of the Society of     504
Maritime Arbitrators Inc.                                                                              505

For disputes where the total amount claimed by either party does not exceed US $  50,000     506
The arbitration shall be conducted in accordance with the Shortened Arbitration Procedure of the Society     507
of Maritime Arbitrators Inc.                                                                           508

(b)    LCH DCR

All disputes arising out of this contract shall be arbitrated at London and, unless the parties agree Forthwith a single Arbitrator, be referred to the final arbitrament of two Arbitrators carrying on business in London who shall be members of the Baltic Mercantile & Shipping Exchange and engaged in Shipping One to be appointed by each of the parties, with power to such Arbitrators to appoint an Umpire. No award shall be questioned or invalidated on the ground that any of the Arbitrators is not qualified as above unless objection to his action be taken before the award is made. Any dispute arising hereunder shall be governed by English Law.

For disputes where the total amount claimed by either party does not exceed US $ _____ the arbitration shall be conducted in accordance with the Small Claims Procedure of the London Maritime Arbitrators Association.

*Delete (a) or (b) as appropriate

**Where no figure is supplied in the blank space this provision only shall be void but the other provisions of this Party shall have full force and remain in effect

It mutually agreed clauses _____ to ___ 2) _____, both inclusive, as attached hereto are fully incorporated in this Charter Party.

On Behalf of Owners:

Split Ship Management d.o.o.
As agent/manager only

Final Hire Statement / mv Lundenes - Island Aggregate Group / Sirius Shipping Incoporated

Delivery location
Delivery time                          December 13, 2006
Redelivery location                    Norfolk, USA
Redelivery time                        April 04, 2008
Total Charter Days
Daily Charter Hire                     3600,00 usd
Daily Charter Hire from

*Charter*

| VESSEL | CHARTERER | HIRE INV. | AMOUNT | PAID | UNPAID |
|--------|-----------|-----------|--------|------|--------|
| LUNDENES | ISLAND AGREGATE | HIRE INV. 005/07 | USD 54.906,49 | / | USD 54,906.49 |
| LUNDENES | ISLAND AGREGATE | HIRE INV 006/07 | USD 54.906,49 | USD 35,000.00 | USD 19.906,49 |
| LUNDENES | ISLAND AGREGATE | HIRE INV 008/07 | USD 54.906,49 | / | USD 54.906,49 |
| LUNDENES | ISLAND AGREGATE | HIRE INV 009/07 | USD 54.906,49 | / | USD 54.906,49 |
| LUNDENES | ISLAND AGREGATE | HIRE INV 016/07 | USD 54.906,00 | USD30,000.00 | USD 25,000.00 |
| LUNDENES | ISLAND AGREGATE | HIRE INV 017/07 | USD 58,639.22 | USD 50,000.00 | USD 8,639.00 |
| LUNDENES | ISLAND AGREGATE | HIRE INV 018/07 | USD 55,506.49 | USD 55,000.00 | USD 506.00 |
| LUNDENES | ISLAND AGREGATE | HIRE INV 020/07 | USD 64,476.85 | USD 47,623.15 | USD 9540,70 |
| LUNDENES | ISLAND AGREGATE | HIRE INV 021/07 | USD 62,876.85 | USD 44,955.00 | USD 10,609.35 |
| LUNDENES | ISLAND AGREGATE | HIRE INV 001/08 | USD 64,476.85 | USD 24,970.00 | USD 32,194.35 |
| LUNDENES | ISLAND AGREGATE | HIRE INV 002/08 | USD 63,676.85 | USD 54422,88 | USD 1941,55 |
| LUNDENES | ISLAND AGREGATE | HIRE INV 003/08 | USD 60,562.50 | USD 50,000.00 | USD 3250,00 |
| LUNDENES | ISLAND AGREGATE | HIRE INV 004/08 | USD 61,362.50 | USD 45,000.00 | USD 9050,00 |
| LUNDENES | ISLAND AGREGATE | HIRE INV 005/08 | USD 61,362.50 | USD 12,000.00 | USD 42050,00 |
| LUNDENES | ISLAND AGREGATE | HIRE INV 006/08 | USD 61,362.50 | / | USD 54050,00 |

| TOTAL | | | | | USD381 456, 91 |
|-------|--|--|--|--|----------------|

12/06/2007 14:12 FAX 345 9494766        CNB FIRES                    @001

# *Cayman National Bank*

Cayman National Bank Ltd.

Cayman National Building
200 Elgin Avenue, PO Box 1097 GT
Grand Cayman, The Cayman Islands
(345) 849 4655  Fax (345) 245 7006
www.caymannational.com

## International Payment Receipt

Branch: Customer Transfers                              Date: 05/12/2007
Received By: Nelmy.Hernandez
Date Received: 06/12/07 09:23 AM

Debit A/C #:  012-25977

**Beneficiary A/C No. 9333142**              Beneficiary:  SIRIUS SHIPPING INC

**Beneficiary Bank Information**
    414077          HYPO ALPE ADRIA BANK AG

        Island Aggregate Group (Cayman) Ltd.
        P.o. Box 864
        Ky1-1103
        Grand Cayman Cayman Islands

**Intermediary Bank Information**
    0509           WACHOVIA BANK, N.A.

    NEW YORK
    USA
Bank Details:       ALPEN ADRIA PLATZ A 9020 KLONGERDUT HAABAT22 IBAN AT79520 0000 0933 3142

Additional Details:

Wire Amount: $10,000.00 USD              Debit Amount:              $8,400.00 KYD

Rate of Exchange:  1.190476              Fee Amount:                42.00

                                         Correspondent Bank Charge:  12.60

                                         Total Debit Amount          $8,454.00 KYD

                        Authorised Signature(s)